All right, we'll hear first from counsel for the plaintiffs. Good morning, Your Honors. Casey Witte on behalf of the Florida Appellants. Federalism and dual sovereignty guarantee that states like Florida receive wide deference when it comes to traditional areas of state concern. SB 846 is a narrow law, and it is directed at the intersection of those two core traditional state interests, determining who becomes a state employee and education. SB 846 in operation functions as just another step in the interview process on the road to state employment. You can think of it just like a background check. That is well within Florida's police power to require prospective employees. Can I ask you a question, and I'm going to ask the other side the same thing because I just want to understand the process. My understanding of the process is that once a student gets an admission into a university, they can then apply for the I-20, and that starts the visa process, correct? That is correct, Your Honor, and I think that goes to explaining one of the crucial distinctions here. Now, there's two I'd like to highlight for the court before jumping into what the two are. But let me ask you another question before you continue. The I-20, when you do the I-20, it has nothing to do solely for purposes of education because you're asking for an F-1 visa that goes to educational status in the United States. That is correct, Your Honor. F-1 visas by statute are directed at a course of study. Now, when you receive the F-1 visa, you may be able to work on campus because in your first year, that's all you can do is on campus, but again, that's only May. You still have to go through whatever process the employer has for purposes of that work. That's right. Judge Glow, I'm glad you asked that question because that goes to the second distinction that I wanted to highlight, the distinction between what authorization is, i.e., what you highlighted, the ability to seek employment, the ability to accept a job offer versus what a job requires to be employed. I'm going to ask the other side, so I'm just saying this so they can be prepared. But Mr. Yin, when he received his F-1 visa, he was a student initially at the Stevens Institute of Technology. Then he was a transfer student, and he transferred in, I guess it's the SEVIS portal, and you have to have the DSO from the new school make sure that your I-20 is updated because that's really, at the end of the day, what's important for purposes of being able to pursue your studies. And that, once he received that, FIU sent him a thing that talked about you still needed to have a completion of your background check requirements, which were different than the foreign influence clearance that was required under 846. Yes, Your Honor. That's our understanding of the record. And I think that goes to highlighting a flaw in plaintiff's preemption theory, that that background check could be the hook for any future preemption claims in the future because it's a wide sprawling background check. And the fact that a background check could implicate preemption concerns, I think points to the direction that that can't simply be right. Now, I would like to highlight a couple of the grounds the district court made when finding that preemption applied here, and we think there are three, and we think they all suffer from individual flaws. Now the first is that the district court seemed to believe that the F-1 visa process seemed to confer a right to be employed rather than that work authorization, that ability to seek employment. And I think a plain reading of the federal regulations as well as 8 U.S.C. 1101, the relevant F-1 section there, there really isn't a right to be drawn from there. We think that arises from the plain reading. Okay. Now, there's also concerns about the DHS security screening, that initial cursory review that the DHS and to some extent the State Department have a role in. Now even assuming, which we do not concede, we think there are different inquiries entirely. But it's a given that DHS has no involvement and doesn't even have to have information on whether or not you have any work authorization or that you're looking at whatever your work employment is that you're trying to pursue. That is correct, Your Honor. DHS is solely concerned with a couple of these questions about admissibility, and they're not looking to see whether or not you have employment. Because Yin had his F-1 visa already when he transferred to FIU and then went to pursue this undergraduate, the graduate, you know, assistantship. But his F-1 visa had already been issued. That's correct, Judge Lagoa. And I think that goes to another reason why this isn't conflict preempted here. Florida's secondary review here, the SB 846 process, actually goes to complement and dovetail with the federal government's concern about security, admissibility requirements. Because a lot of those F-1 visa to maintain your F-1 visa, you have to not be committing crimes. You can't be a subvert, a espionage agent. You can't be doing certain things. And even then, the discretion of the Attorney General is involved, which is pretty wide in the immigration context. So under the federal regulations though, isn't on-campus employment pursuant to the terms of a scholarship, fellowship, or assistantship deemed to be part of the academic program of a student otherwise taking a full course of study? Judge Rosenbaum, I think that's plaintiff's strongest point here. But I think that sentence makes sense in context of the whole regulations that a course of study, and I think the other regulations bear this out, that a course of study is entirely separate from the academic program. Academic program, I believe, if I recall correctly, that section of the CFR occurs three times. One is in regards to an employment strike provision that sheds some light that that has a wider concept and doesn't go to the validity of the F-1 visa. But even if it did have some bearing on the course of study, I think it's important to recognize that this is a triple layer cake of discretion that Congress has given to the states. Congress struck a balance with the F-1 visa system when it told states and state institutions that this is a voluntary program. You can opt in. At the same time, Congress said it is entirely up to your discretion on who to admit. And at the same time, it's not really contested that employers have discretion on whom to  And the Supreme Court has stated that is an especially acute interest when it comes to traditional state concerns. You can see that in the Supreme Court's decision in Whiting, the plurality. But even looking at Garcetti, it states that states, with regards to their own state employees, have an acute interest. And if I could direct your attention to footnote, I believe it's 11 of the Supreme Court's decision in Garamendi. That weighing of the interests, especially when we have the intersection of education, as this court noted in Estrada, as well as the employer-employee regulatory relationship, and even then on top of that, that state-employer relationship, that is crucial when weighing. Can I ask you a question? Because this is where I'm, it seems to me that when I look at Mr. Ying's, the documents that have been provided for him, the FIU said I, this is from April of 2024. I'm reaching out to inform you that you've submitted your 2024 graduate assistant contract. This appointment is pending satisfactory completion of the FIU HR new hire GA sign-on process and required background check. So even, even if he was doing a study and he wanted to do this, this particular thing, he still had to submit himself and, and satisfy the background check that was required for that assistantship. That's correct, Your Honor. So let me ask you a question. Just out of curiosity, has, has the Board of Education approved any of these at all since it's been in place since 2023? Judge Rosenbaum, I have spoken with the Board of Governors. That is the relevant party here. The Board of Education certainly plays a role, but that's for state colleges. As far as the university context, yes, there has been one approval. I can tell the court that that's just plainly not in the record, but yes, there has been at least one approval. Okay. And when was that? Your Honor, I believe that was within the past calendar year and a half. It concerned an academic program, which actually involved China. There was a consortium of research interests there, but that did not go directly to employment. But there has been an approval under SB 846, albeit a different provision of SB 846. Oh, I see. So, so has anybody been approved, approved for employment under this? Your Honor, we're not aware of any as of this point. Now I think that we... Are you allowed to process? I'm sorry. Go ahead. Is the board allowed to process it, or is it, it's stayed, but only as to these two individuals right now? Yes, Your Honor. Judge Ago, thank you for raising that. The initial injunction here was a universal injunction before the stay panel got to it and narrowed it to the parties. I think out of an abundance of caution, the state of Florida does not want to violate any court orders. So I think that probably chilled the process some line along the way. But I think that also presents another ground for reversal at the very minimum. This court should reverse in line with the stay panel. But I see I've got two minutes left. Well, I've got a couple of questions for you, counsel. Of course, Judge Marcus. First, help me with the process itself. If you go to the board and the board rules that in their view, the national security of the United States would be affected in a deleterious way by allowing the student to come in and work in connection with the Ph.D. program, does the statute build in any appellate remedy? Your Honor, I don't believe there, I believe there is a review process involved. I would direct you to the statute. But I looked at it. That's why I'm asking the question. I had trouble finding if somebody was aggrieved and said, well, I don't agree with the judgment of the Board of Governors, where or how they would proceed in a court of law. Your Honor, as a baseline matter, they could certainly just reapply. The Board of Governors doesn't put any limitations on how many times an individual That I appreciate. My question is, is there a provision allowing for judicial review of the Board of Governors determination? I can't find it in the statute. Maybe there's something else in Florida law that would allow that. Your Honor, I think that might fall under some of the administrative procedures. And Florida does have some administrative procedures analogous that could provide an avenue for review, I believe. Now, obviously, we didn't brief that, but that's why I understand. I was just asking that question. Let me ask a second question, a more basic or fundamental question. 846 looks to whether a foreign principal, which could be, of course, a student, is a threat to the safety or the security of the United States or its residents. That's the statutory command that the Board has to measure the student against. The federal government, in its own right, creates a process. Maybe it's inferior. Maybe it's not. But among the things that are required to look at are whether granting the F-1 visa to a student would affect national security and the foreign policy of the United States. So it looks as if what this statute does is it superimposes an additional review by the state on stuff that's already been examined by the federal government. That would be a fair and accurate way to describe it, or have I misunderstood that? Judge Marcus, I certainly don't think that SB 846, and I see that my time has expired. No, please. You're helping me with my question, so you're on our time. Of course. SB 846, we certainly don't see it as reviewing or second-guessing the determination of the United States. That F-1 visa inquiry, those questions that the federal government asks, happens at a singular point in time, oftentimes at the consulate in the Philippines. Right, but the statute and the regs require more than just asking whether you're a member of the Chinese Communist Party or something like that. It requires a determination that allowing the visa to be granted would not be deleterious to the national security or foreign policy interests of the United States. Maybe they do it well, maybe they do it poorly, but they ask the same basic question that 846 requires the Board of Governors to ask. And I guess what I'm asking you is, do I have that right? Would that be a fair and accurate description of the standards that govern the federal court, the federal State Department, Homeland Security on the one hand, and the Board of Governors on the other? Both are asking essentially the same question. Will allowing the student in create a risk to the national security or foreign policy of the United States? Yes, Judge Marcus, we think roughly it's the same inquiry and that directly goes to what the Supreme Court stated in Kansas v. Garcia. I understand that Kansas v. Garcia is a somewhat different case, but I want you to help me here understand. So the State Department can conclude that Jones should get an F-1 visa because he does not evince a risk to the national security or foreign policy of the United States. And he's allowed to come in to get a Ph.D. program and then to work in connection with the Ph.D. program, there are rules that are very specific about that. Then the Board of Governors can come back and say, we've reviewed the same guy. And when we look through the lens of whether the foreign principle is, quote, a threat to the safety or security of the United States or its residents, we think there is a risk. And we're not going to allow him to be involved in a Ph.D. program that involves teaching work in relationship to that. Can the State of Florida impose a higher standard, a more stringent review standard on this determination than the federal government imposes where the statute requires it ask and determine basically the same question? Yes, Your Honor, we do believe it can. And that's for a couple of reasons. One, this isn't an immigration statute. It doesn't regulate who can come into the country and under what conditions they can do so. And second, it's a... But doesn't F-1 visa regulate whether you can come in here and get a Ph.D. at the University of Florida or FIU? Yes, Your Honor. But an adverse determination by an SB 846, the Board of Governors panel, has virtually no impact on the F-1 visa itself. It doesn't impact the course of study that a student's pursuing, and nor does it automatically alert a DHS or a Homeland Security official or the State Department that, hey, you need to revoke this... But this is why... I guess this is where you're going to have to explain this more fully to me. Of course. Judge Marcus... Just bear with me for a second. Just when Judge Lagoa asked you about the procedures, ultimately, a student, Chinese student in Singapore, says, I want to study mechanical engineering at the University of  They've got a Ph.D. program, and as part of the program, I've got to be a teaching assistant, maybe teach some undergraduate courses, so on and so forth. The university reviews it. The university says, okay, they fill out the form. The I-20 goes forward. Ultimately, the federal government has got to decide, are we going to let this exchange student come in from Singapore to the University of Florida to participate in that program? Among the things we are required to answer is whether that student poses a national security risk to the United States. They answer, no risk. He can come in. We grant the visa. But he can't come in under 846 if the Board of Governors says, we've reviewed the same person, and we've reached a different conclusion about the same basic question. National security risk, foreign policy risk. Tell me why Florida can impose a greater standard than the federal government has on allowing him into the United States for a study. Judge Marcus, I want to be very clear here. SB 846 cannot prohibit any student from coming into the United States. The F-1 visa program is the federal government's province. Now, the F-1 visa grants admission. SB 846 is solely directed at employment. And say, and this will not always be the case. We think that these two processes happen at different times, and the SB 846 national security determination will often always, sometimes it will occur before, but oftentimes after the federal government makes its determination. It's looking at a fundamentally different mix of information. Well, I thought that before the F-1 student may engage in any on-campus work or employment, the federal government also sets out some very specific and particular rules of the game. Among them are, one, the F-1 student may engage in on-campus employment, which will not displace a United States resident. So that's the first determination the federal government requires. Second, it says on-campus employment must either be performed on the school's premises or at an off-campus location educationally affiliated with the school. Third, it says the employment must be an integral part of the student's educational program. Fourth, the federal government, the regs and the statute require that any on-campus employment must not exceed 20 hours a week while the school is in session, unless an exception is made for a severe economic hardship. Finally, it says an F-1 student may not engage in on-campus employment after completing a course of study with a couple of exceptions. So the federal government has not only made a determination of whether there's a foreign policy risk to letting him in at all, but before he can work as part of the Ph.D. program, you've got to jump through these other hoops. Can you impose additional conditions is really my question. But the United States government, to be clear, when they apply on the I-20 to get the F-1 visa, the United States government does not need to be provided with any information as to what that student's employment will be, correct? That's correct, Judge Lacoa, and Judge Mark is going directly to your question. There are fundamentally different considerations. There are different questions that the I-20 and F-1 visa admissions process go to. As we outlined in our briefing, that is a pretty cursory process that goes to, do you have a course of study? Have you been admitted? Do you present a security risk right now? Those regulations that you mentioned, we don't understand the federal government's scheme. The DHS or State Department employee, whoever's conducting those initial F-1 visa interviews are not asking about when are you starting work? What job do you have? Those are not the intricate considerations that Florida's SB 846 process... The 846 process goes to foreign influence because, in fact, there were issues at the University of Florida with regards to foreign influence, with regards to professors and graduate students, correct? That was one of the issues that the legislature decided to try to address because there were problems that were created. That is correct, Judge Lacoa. So this is no different than a background screening because at the end of the day, FIU, even in order to do this graduate assistantship, you still have to have a background screening that you have to pass, just like any other state employee has to pass, correct? And this is just an additional...  And this is what any other employee has to pass, is that, I mean, it's something in addition, right? Because you're a foreign national. I mean, the other foreign nationals from other countries don't have to pass this, right? Yes, Your Honor. And that goes to this court's recent decision in Shen where... I'd still like an answer to my question. Yes, Judge Marcus. I have not forgotten. But I would... Give me your answer, please. Of course, Judge Marcus. We think those... Now, I want to directly address those regulations that you mentioned, the CFRs. Those are not regulations that the initial entry questions are concerned with. Those individual regulations govern what the designated school officer looks at for continued compliance with the F-1 visa. There's no way that the F-1 visa initial questions can determine whether or not someone's working 20 hours a week because, quite simply, they haven't started working yet. There's a fundamentally different interest and set of questions that are asked later on by different officials. And SB 846 captures other considerations that the CFRs might not. And going to Judge Lagoa's question, that was the original intent behind SB 846. There were undisclosed agreements with Chinese entities that presented a real problem for a variety of issues that might involve federal enforcement, might not. But also, I think the original platonic example of why SB 846 exists might help you, Judge Marcus. A student receives an F-1 visa. They're domiciled in Russia. They come to the United States. They're certainly not a foreign asset. But then, while they're there, they get a message from the KGB F-S- Again, the same determination has to be made. National security risk, foreign policy risk. Uncle Sam makes it. He says the student passes. You make it. You say the student doesn't and he can't work in relationship. It's a peculiar kind of work because it's tied so closely to the Ph.D. kind of program. So let's just suppose Florida, Uncle Sam imposes five conditions before they say you've passed mustard. One, two, three, four, five. I hear you to be saying Florida can impose five more conditions, six, seven, eight, nine, ten. And if he doesn't make it, he can't work here. If he can't work here, the Ph.D. program is probably gone with the wind. Suppose the state of Texas turns around next year and the state of Texas says, we've got a powerful police interest too. The Chinese are stealing our secrets blind and it's undoubtedly true. And so, notwithstanding Uncle Sam having used five conditions to pass mustard, Florida had five others. We've got still others. We've got 12, 13, 14, and 15 as our conditions. And before you can work as a Ph.D. student at the University of Texas in Austin, we've got our own Board of Governors in the state system. Could you have 10 or 20 or 50 different standards governing this precise question about whether a foreign exchange student could come in, enroll in a Ph.D. program, and work in relationship to that? Is that a risk here that we have? Judge Marcus, I certainly understand the slippery slope problem that you're getting at. But here we just have two criteria and they're very modest. And we think they fall into the brush. That doesn't really answer the question. I'm sorry to interrupt, but that doesn't really answer the question. I think I hear you to be sort of implicitly conceding that that could happen theoretically. And if it did, it could be problematic. Am I mistaken? Judge Rosenbaum, it certainly could happen, but I think it's only problematic if those extra considerations, those 6, 7, 8, 9, 10 considerations, do not assist the foreign government in some way or fall under those traditional police powers that the states have. Of course, if we have states wheeling and dealing, making their own foreign policy, that is really an issue. No, but let's just suppose the legislature in Texas says, we, too, are concerned with whether the student, call them a foreign principal, is, quote, a threat to the safety or security of the United States. Notice, safety or security of the United States, not even the safety or security of Florida, but the safety or security of the United States or its residents. And we've got our own standards. Is it difficult to imagine that a foreign government, which may have some interest in its students living overseas, is going to have to deal with 50 different sovereigns in connection with work-study programs for PhDs? Does that create a problem, a conflict of some kind, an obstacle of some kind, sort of the language of conflict preemption? That's what I want you to help me with. Of course. Here, we do not think there is a conflict. There is a hypothetical set of state laws that where if an individual state sets forth and it's deciding who is and isn't on the naughty and nice list for countries and foreign adversaries, that certainly presents an issue. But here, as this court recognized in Shen, the federal government has already designated these countries as countries of concern. Here, we're dovetailing with the federal government's purported foreign affairs power, and I would be remiss if I didn't note that we are way off base from cases like Crosby and Garamendi, where we had foreign countries sending diplomatic communiques to governors of states, filing amicus briefs with the courts, and even in Odebrecht Construction, we had multiple countries filing WTO complaints about the specific Cuba amendment there. Here, we have none of that. Now, I see that I'm 17 minutes over. But you've been on our time answering our questions, and I have one more. Of course. Assume for the purposes of my question that you've got a problem with creating an obstacle under the doctrine of conflict preemption. Just assume that. Maybe that's right. Maybe that's wrong. I just want you to accept that for my question. You argue, as well, that the district court entered a universal injunction in the course of the preliminary injunction review here, and that cannot be squared with Trump v. Casa, the most recent Supreme Court ruling. What kind of remand instructions would you have us give the district court? Assuming we were to conclude that's dead right, the preliminary injunction has to be vacated because the scope of the injunction was universal, and a district court sitting in Florida is not free to dictate the rules of the game for the entire state and any other plaintiff who may walk in. What kind of remand instructions would we give them? Judge Marcus, we think a straight-up vacatur and then instructions on remand to enter an injunction pursuant to Trump v. Casa would be more than satisfactory here. Now, of course, we don't concede that there's conflict. No, I appreciate that. That's the second issue that you had raised in this case. So what would the injunction say? The plaintiffs get relief in this case, period, beginning and end. Because they're going to come back and say, no, no, that doesn't do the trick. Well, Judge Marcus, I think you're actually tapping on a couple of the standing issues that are at issue here, the redressability concerns that we raised. Because I'm going to ask, if we sent it back and said it has to be tailored to the particular two plaintiffs so it can't be universal and it goes back, it's not a guarantee. FIU is not here. There is no guarantee that FIU would give them the assistantships. Number one, they still have to do the background screening and all other things, but there's no guarantee that FIU would think that they could violate 846. Judge Loa, that's very correct. The city of South Miami, Jacobson, make it clear that non-present third parties, when it comes to redressability, presents a real issue, and we think that that causes a real redressability as opposed to the traceability. Right, but that would be a prefatory question. If that's right, we would go no further than saying the district court was without jurisdiction and so are we. End of story. Vacate, dismiss, lack of power to handle the case. We'd never get to the merits if we didn't have the power to entertain it in the first place. Judge Marcus, that's correct. Plaintiffs are the master of their own complaint. They left FIU off the defendant's list, and that causes a jurisdictional defect, which really precludes all of the discussion we've had here today. But we are happy to succeed on standing. If there are any further questions, happy to answer those. But before I finish, Judge Rosenbaum, we believe that Shen is directly on point to your question asked about seven minutes ago. So if this court is looking to cases, it should look to Shen, Winn, Estrada, and Whiting. Thank you so much. Thank you, counsel. And we'll hear next from Mr. Sadowski. If it may please the court, there's a lot to discuss. I want to start, because it answers a number of your questions, with the TA job offer that Mr. Yin was offered and the process. So I think you might start with whether we have the power to entertain the lawsuit in the first place. Sure. You have the power to entertain the lawsuit because under Lewis, the fact that there's an entity that's regulating the conduct and issue, and there's an entity that's regulating the conduct and issue, that solves the traceability question. As far as the redressability question, I think that's solved in two ways. One, it's solved in two ways. No, I think redressability isn't the heart of his argument. I think traceability is the argument, and the question here is whether there is some causal connection between the injury, which is financial and substantial, and the conduct complained of. So the traceability here is that it is the board's regulations and the board's enforcement mechanisms that prohibited the FIU, which originally gave him a job offer. But can I ask you that? Because with respect to Mr. Yin, did he do what he was supposed to do? Did he go through the required background check at FIU? So I need to clarify a question. By required background check, do you mean the universal background check that all applicants at FIU are required? I don't know. Are you talking about the 846 process? It says once you complete all the required steps, the university graduate school will be the final approver, and your contact will then be routed to payroll for processing. So that's in addition to the – additionally you will need to complete the foreign influence clearance, which is the thing that goes to the board. But did he do what he's supposed to do with FIU? My understanding is he did. That's not in the record. My understanding is also that he is currently a teaching assistant at FIU, so he would have had to do it again. When he actually got the teaching assistant position after the injunction was issued. Now – Can you respond to Judge Marcus' question? So it's the government's regulations at issue and the government is the enforcer at issue of HB 846. That's how the statute is governed, right? The statute says that FIU is not allowed to hire its students unless it gets approval in a cumbersome, months-long process by the board, and that the penalty for that – this is why there's no judicial review – is not that they can sue and require it or that some other administrative thing, is that the board can unilaterally withhold funding and other penalties from the school if the school does not comply. So it is much like, as we mentioned in the briefs, the situation with the TikTok ban, right? The TikTok ban did not actually prohibit TikTok from doing anything, right? It prohibited servers such as Amazon Work Services from hosting TikTok. TikTok is still the regulated party. They are still injured by the regulator, which is not Amazon Work Services. It's, in this case, the Department of Justice. And in this case, it's the same situation. They're not injured by Florida, who's only prohibited – who's the sort of direct regulated, but the targeted regulated individual is Mr. Yin. Now, I want to go back to the process, right? So on November 3rd, Mr. Yin's offered a job approval, a job offer as a TA to start December 18th. It's a one-semester job. That's at page 140-what, right? So on November 29th, the FIU reads, in light of the statute, Regulation 9.012 and further BOG guidance. That guidance, which is on their website, specifically states, because the statute itself is ambiguous, that the Contracts and Agreements Clause applies to teaching assistant and research assistant positions, and that domicile is determined by someone's citizenship unless that they apply for U.S. citizenship in this country. That process, which is also on the guidance, is an eight-step process. The first step in that process is to meet with the General Counsel's Office. A later step in that process is approval by the Board of Regents at a Board of Regents meeting. The Board of Regents only meets five or six times a year. The next step in that process is to submit the Board of Regents' approval to the Board of Governors, which, again, only meets five or six times a year. And that submission needs to take place no less than four weeks before the next meeting. After that, there's some short written questions. As you can see, if you look at the Board of Governors meeting notes for – where is it? I have the date somewhere, and I apologize. I don't have it, but if you look earlier this year, and I can submit the dates of the Board of Meeting as to the Florida State Consortium. So that process takes – if that process took place now, the next Board of Regents meeting would be June 30th, and then the next Board of Governors meeting would be September 2nd. And so if he was looking for a job for the summer, which he was in 2024, for a job that would have started May 6th and ended August 2nd, that approval would happen early into the FIU's fall semester at best. So this explains why there's been no approvals on employment, at least certainly not for TA or RA positions, by the Board of Governors. The process takes too long. Let me ask you – I asked your colleague the same question. When I reviewed the statute, the Board of Governors enters a ruling. Is there any appellate remedy, any right of review in any state or federal court built into it? No, because the exclusive remedy is the Board's own discretion to withdraw funding from the state. He suggested it might be subject to review in the normal way that an administrative remedy might come up to a court as well, that there be a default position in another body of law that would deal with it. I think that's what I heard your colleague to say. I'm not an expert on Florida state law. I just want to know whether someone's left without a remedy, whether the Board of Governors can drill the issue dead, end of story, no judicial review, nowhere. That's my understanding. I'm not aware of any remedy that the individual would have. All right. Help us with the merits. Tell us why you see this as having a conflict preemption problem. So as you mentioned before, in order to obtain an F-1 visa, there is a national security process that involves an interview and that takes place with the State Department and a national security analysis. There's also detailed regulations as to what positions and when an individual who has an F-1 visa may work, including at a school. And indeed, Section HCFR 214. The United States doesn't get involved in whether or not someone receives employment or what type of employment they receive when they're issuing the F-1 visa. I think there's two responses to that. One is I don't think that's accurate. They don't make a specific issuance on an individual basis. I mean, it's not in the I-20. You're not required in the I-20 to say, you know, I'm going to be a GA or a TA or an RA in, you know, a lab. No, but it is in the Code of Federal Regulations as to what jobs they are and are not allowed to have. I understand that it is a may, but it's not a shall. An F-1 visa doesn't say that you shall be given that. It's just a may. And that's the federal government's prerogative. If the federal government wanted to come up with a more robust program, it could have. And it doesn't affect the fact that the state government's— So let me ask you a question. The University of Miami, so a private institution, if they wanted to do a background security check on a foreign national when they were going to give them a PhD, an RA position, would that be allowed or disallowed under your theory? It would probably, if it was different and contrary to the background check that it gives all students, it would run into a Title IX problem. Or if it's an employment, I guess, Title VII problem. So your suggestion is if they did it to everyone, it would be allowed, but if they targeted particular foreign nationals, it would not be allowed? Yes. Okay. Going to a few other things that I just wanted to respond to. The government argued in its opening that this was a matter of state concern, but SB 846 by its own terms defines this as a national concern. And while it may support the national government and its policy of national security, it's not— But you would have to concede, would you not, that the state of Florida has a powerful police interest, police power interest in this? I would not concede that because— You don't think the state of Florida has a right to be concerned that secrets that are being in technical areas that are involved in research in the best universities in the state are having those secrets stolen by the Chinese government or some other government that may be listed isn't a serious problem? I think it is a serious— Why don't they have a powerful interest in it that's sufficient to say they have a right to be heard as well? Because— There's no question they're asking the same question that Uncle Sam's asking. Yes. There's no question they're asking the same question that Uncle Sam's questioning, and that's why I wouldn't concede that, right? It is the national—the federal government has, in this instance, taken the prerogative as the Constitution demands of it to determine these national security interests. And the state government, just as in Arizona's, cannot take a different and contrary position even if it has the same interests in mind. Let me give you an example of where this—why this problem is real and immediate. It happened long ago and far, far away but may bear on it, and I want you to help me with it. There was a boat lift from Mariel Harbor in Cuba going back to 1980. Basically, the island was about to explode, and Castro allowed anyone who wanted to leave Cuba to leave from the port of Mariel on the north coast of Cuba. And scores, if not hundreds, of folks took their boats from South Florida and evacuated people from Cuba, and they came into the United States. The problem that arose, however, was that Castro opened his jails, and he put on those boats anywhere between 15,000 and 20,000 murderers, rapists, sociopaths, et cetera. Now, this was a whole area of exclusive federal interest. And so when these people hit the shores at Key West and the government had people there to decide who would be paroled in, basically everybody got paroled in. And if you measured the homicide rate in Miami-Dade County, it went straight up. The state of Florida had a powerful interest in the failure of Uncle Sam's national security and foreign policy interests. The state attorney at the time, Janet Reno, was extremely clear about the failure of the national will in enforcing these interests in immigration. The state of Florida argued that they had a powerful police interest that was concurrent with the interest of the United States government in deciding who to parole in or not. Very different from what we're talking about here, but the overarching police power interests were very, very powerful. Why doesn't the state of Florida have an interest in securing the integrity of what's going on in its institutions of higher learning state colleges? Because I think you jumped at that last part of the question. I think for most of your question you're somewhat describing similar facts to United States versus Texas in the Fifth Circuit. That will probably be heading to the Supreme Court next term. But the issue in that situation, these are not super hypothetical as it relates to Texas, right? Texas argues that the federal government's permissively allowing people into this country is negatively affecting, and so it took upon itself, and I think this is probably permissible, to busloads and to fly planes of individuals from Texas to New York to spread sort of the negative effects it felt of unlawful immigration. Now, under our federal system you have the right of free movement, and so it's not possible for Florida to say we don't want these people in our states, and so the federal government should keep it out of the country because if they parole in through Mississippi they can equally come into the United States or through California. It's just like they can come into Florida and move to California. But the state of Florida is saying more here, counsel. The state of Florida is saying we have a direct interest. Our police power certainly goes to who is employed in our universities. And their interest is that the employment in the university, I think, doesn't work for two reasons. One is this is not a prohibition on employing in their university. They could have read a law that told Florida State Universities not to hire people. In that case, FIU would be the primary and sole proper defendant in this case. Rather, it regulates their conduct through a. . . So the state of Florida could say to its state universities, thou shalt not take in any exchange students from and list a series of countries, Cuba, North Korea, China, and so on. Could they do that? I don't think so. I think the state of Indiana just specifically created that law, and I think my organization will be challenging that law in the near future. But that's a. . . I mean, it's the same and a different question, right? Because, you know, as we mentioned in our briefs, right, that the status of Chinese citizens in the United States and their right to the visas granted to them are an issue of national concern, which the federal government may very well have a different view than the state of Florida, right? But isn't the state, and when I use the state, I use it universally because the state university is really an extension of the state. But isn't the state and the university the best person to know what is needed in terms of its employment screening and background, what it needs in order to make sure that its facilities are secure? I think those same arguments were made about black and Hispanic people in the 1950s and 1960s, right, that it's always been we should be the people who have the right to decline to hire and for our reasons, but there are serious discriminatory. . . But that's a really—that's not accurate, okay? You have things where you have University of Michigan, where you have Chinese nationals who are in the University of Michigan system bringing in biological material that is potentially, you know, problematic for our agriculture in the United States. Those charges were dropped, and that person ultimately pleaded to making a false statement. Let me see if I could just bring it back around to what I think is the question that Judge Marcus was asking, and he can correct me if I've misunderstood. I think, you know, I think you have to concede that Florida has a compelling state interest in making sure that, you know, that its people are secure, that its intellectual property is secure, you know, that when new ideas, new products, new scientific advancements are developed at Florida's universities and schools, that, you know, Floridians reap the benefits of that, right? And so Florida has a substantial and compelling interest in that. That is a different question, though, than whether this particular law conflicts with, you know, there's conflict preemption, there's an obstacle that it presents to the United States law. I mean, to me, I see those as two different questions, but I don't see how you cannot concede that Florida has a compelling interest. In its state citizens, yes, but I just want to say, if that's how HB 846 stated its interest, then I would apply it. The test here isn't whether it's the safety of the states. It specifically says the national security of the United States. And Florida doesn't have an interest in protecting the safety and security of New Mexico and the people of New Mexico's intellectual property. It would still be, as you mentioned, preempted. So you think you'd lose the case if 846 was drafted just slightly different and it required the Board of Governors to look at the question of whether a foreign principle is a threat to the safety or security of the people and state of Florida. If that's what it said and they went to the Board of Governors, this would all be okay? Is that your position? No, Your Honor, and I was just about to get into that. So it isn't a drafting problem, really, is it? It's not just a drafting problem. I guess I'm trying to understand. Is it your position that the state of Florida would never have a compelling police power interest in guaranteeing that its facilities are secure? So, like, for example, University of Florida has a lot of research that it does, and it's research that has been used for a variety of things. So are you suggesting that they don't have an interest in protecting that? No, I'm not suggesting that. Okay, well, then I'm confused by your argument. Again, it's simply that so the first instance, they don't have an interest in protecting the United States' security. They do have an interest in protecting Florida's citizens. But even if this was limited to a test about Florida's interests, which HB 846 does it, it would still be preempted because they're still making a different conclusion than the government. They're still second-guessing it, and I can show as a hypothetical. The state of New York might decide that the state of Israel is a problem, that they might agree with boycott, divestment, and sanctions, and they may not want people from Israel teaching or studying at their universities and may put a prohibition on the state of Israel. They may not even use specifically citizenship in that hypothetical. They might allow people who are protesting in the state of Israel, if they can establish to the board of governors of the New York universities, meant that that person is actually a supporter of the Palestinian territories, which is actually how a lot of boycott, divestment, and sanctions boycotts work. That would still be preempted under Crosby. They are still, the United States is making a determination of Chinese citizens' ability to not only enter the country on an F-1 visa, but under what the conditions of employment are. And vis-a-vis China, vis-a-vis the world generally, they're allowed a universal background check. They're allowed to only have tall people on their basketball team. They're allowed to have, I don't know, they're allowed to say that you have to have a certain SAT score or GRE score to be a teaching assistant at the university. But as it relates vis-a-vis China, they cannot make a second judgment of the government's security determinations that have already been made or the conditions on the rights of employment that are part of the F-1 program. Can they make a determination that says, do you have any contact or contracts with a Chinese national to provide information to them? The federal government could ask that. The state government could ask that. It doesn't. The form, if you read the form that is used, it's a simple form. It requires the signatures of the Board of Trustees and a simple description of the program or contract at issue. I'd like you to help me with a case that your colleague cited to us. It's an interesting case decided recently in this court, Shen v. the Commissioner of the Florida Department of Agriculture. In that case, the law imposed several new requirements on foreign purchasers of property in Florida. It prohibited, among other things, any person domiciled in China from owning any interest except a diminished missed interest in real estate subject to narrow exceptions, and it imposed registration requirements for those owning property in the state and required all purchasers of real property in Florida to sign an affidavit of compliance with state law. Similar issues came up there, and we held that the registration and affidavit requirements of the law were not preempted by federal law. Why is this case different from that? Because they didn't require or prohibit anything that the federal regulatory process didn't require or prohibit. So if you were allowed to purchase land, other than the purchase exclusion, which the court did not reach because there was no standing, you would be still able to purchase. You just needed to simply do a simple administrative reporting that did not affect the plaintiff's ability to purchase the land at issue in that case, as opposed to the record here that shows that the going through the four-plus-month process in itself prevented them from working. The court implies, although it does not expressly state, that as for the purchase prohibition, because that does prohibit something that is specifically permitted under the federal regulation, that that would probably be preempted, although it does not go so far to hold that. Let me ask you a slightly different question. Let's assume we've moved beyond standing and traceability and the power to adjudicate the claim. We've moved beyond the question of conflict preemption. I want you to help me with the injunction that was actually issued by the trial court. Wasn't that a universal injunction, and doesn't that run smack into Trump v. CASA? Yes, it was. And doesn't it have to be vacated and remanded?  What would you have us say if we got that far with the district court on remand? Is the relief limited to these two plaintiffs? It might be broader in the sense that it's limited to what's necessary to effectuate the rights of these two plaintiffs. I'm not sure it would be broader. I think it's for the district court to decide in the first place. That being said, if this court decides in a published opinion that our client's rights have been vindicated, the precedential effect of that statute alone might make what happens on remand resolvable potentially by… Let me frame the question more sharply. It gets back to the district court. We've jumped over one and two, and those are big issues, but we get to three, the third act. Can the district court enter any relief here that goes beyond these two plaintiffs? I don't know. Does he have the equitable power to say more than these two plaintiffs prevail, nothing more, nothing less? What I can say, which might answer the question, is if that happened, we would likely and could not agree to resolve this case with the government. We'd probably move to amend this case to be a class action as Kavanaugh's concurrence in CASA. Well, that might be a day late and a dollar short as far as this district court judge was concerned. I don't think the timing for that has expired. It's kind of an odd thing, right? Because we're talking about conflict preemption, and we're talking about, you know, the obstacle that it presents to United States, I mean, foreign policy, for lack of a better word. And so it does seem… I mean, I think you're right to concede that Trump, the CASA case, requires that we not approve of a universal injunction. But it does seem a little bit odd, right, that if we thought that there was a problem because of the conflict with the United States government's position, that we would just direct an injunction with respect to these two individuals. So I agree with that, which is one of the reasons why I agree that the dissent in CASA was correct, but I'm unfortunately not the last word on these things. That being said, I think there's a difference. Nor are we. Fair enough. The reasoning of the court and the scope of the injunction are two different things. So the reasoning of the court would necessarily imply that the law was invalid as to other people besides our plaintiffs, even if the injunction only covered Mr. Yin and Mr. Gao. All right. Thank you, counsel. And Mr. Witte, you have reserved three minutes. May it please the court. There are a couple issues. First, on traceability, we think that this court would be correct to reject it for lack of Article III standing. We think the district court below straightly engaged in the writ of erasure fallacy, which we point out in our reply brief and that this court recognized in Jacobson. It simply looked at the parties, didn't really assess whether or not FIU was a crucial component, which was the critical error here. At the end of the day, the Board of Governors never received an application from FIU concerning either Yin or Gao, both of the plaintiffs here. And so creating that traceability chain is really impossible here. Now, I would also like to touch on preemption. F-1 visas set the floor for what a state regulates. They certainly don't set the ceiling. If Congress had intended that in its purpose of the scheme here, it would have said so plainly. And here, even if you recognize or reject that premise, I think there is no case where the state's interests here are more acute. We have three, really, in actuality, core state concerns layered on top of each other. We have what it means to regulate education in a state. That's this court's decision in Estrada. We have what it means to regulate an employer-employee relationship. That's the Supreme Court's opinion in Whiting. And then on top of that, we have the state regulating its own decisions on who to employ. That's Garcetti. And when you look at footnote 11 in Garamendi, the Supreme Court notes that those interests should be weighed when deciding whether or not something is conflict preempted. And so as Florida's potent, as Judge Marcus, you noted, as its potent police interests rise, so does the floor for something to be conflict preempted. And as this court noted in Shen, there is a legitimate interest that Florida has for national security. If you go back and look at this court's recent opinion, you'll note that it says national security or national interests, one of those two terms, is certainly a legitimate basis for a state law. Florida did so here. I also think it's quite revealing what Mr. Sadowski was saying about plaintiff's theory of preemption. Suppose you take away SB 846. Suppose an individual at FIU who is employed in their cold spray lab, one of the foremost space technology labs in the country, decides that an individual domiciled in China who just finished 10 years with the Chinese intelligence service here on an F-1 visa decided that they wanted to be employed in the patent division of that lab. I think that it is telling that under plaintiff's theory that that is just a question or a denial that the FIU lab tech couldn't make. That would be preempted under that theory, and that simply couldn't be right because those determinations happen every day in America. At IBM, at GlaxoSmithKline, at the University of Miami, as Judge Lagoa noted, simply because Florida exercised its police power to make it clear what matters to the state of Florida certainly doesn't run afoul of the supremacy clause. Thank you. All right. Thank you, counsel. We've completed our cases for today, but we note that there are students present.